ELIZA J. MARKEY *vs.* MUTUAL BENEFIT LIFE INSURANCE COMPANY.

Essex. Nov. 9, 1874. — Jan. 6, 1875. Jan. 28, 29. — Sept. 3, 1875.
AMES, J., absent. ENDICOTT, J., did not sit.

If a bill of exceptions states the evidence and rulings with substantial accuracy, and the certificate of the presiding judge, stating his reasons for disallowing the exceptions, and the evidence taken by a commissioner upon a petition to prove the truth of the exceptions, show that the only variations are merely verbal and quite unimportant, the truth of the exceptions will be taken to be established.

On the issue whether a policy of insurance, for which a written application had been made by a husband for the benefit of his wife, had been delivered to the wife by the agent of an insurance company with the intention of vesting the property in her, there was evidence that, the husband being ill at home, the agent came to the

house, bringing the policy with him, and passed it to the husband, saying that he had brought him his policy; that the husband said he was glad of it, he had been expecting it; that he took the policy and read it over, and handed it to his wife, saying, "There is your policy;" that she took it, glanced it over and laid it upon the table; that the husband told the agent "that he was not well enough to go out and get the money to pay for the policy; that he had made an arrangement with B. at the shop" (where he worked) "to get the money for the policy;" that, when the agent started to go out, the wife took the policy from the table and passed it to him, saying, "If you are going to B. for the money you may need the policy, and may as well take it and leave it with him," and the agent took the policy; that her object in giving the policy to the agent was that she supposed he was going to B. to get the money, and the latter would want to see the amount; that upon learning the next morning that the policy had not been delivered to B. by the agent, the money was immediately tendered and a demand made for the policy, which was refused; and that when she took the policy she understood it was delivered to her to keep. *Held*, that this evidence would not warrant a finding of such a delivery of the policy as to constitute a binding contract. *Held, also*, that the evidence showed that the only form of contract contemplated by the parties was by a policy issued upon a written application, and that there was no evidence of an intention to make a contract in any other form.

CONTRACT. The declaration originally contained one count. Those entitled second, third and fourth were added at different times by amendment. The first count alleged that the defendant made a policy of insurance upon the life of her late husband, James W. Hoyt, in the sum of $3000, payable on his death to the plaintiff; that Hoyt afterwards died, and the defendant owed the plaintiff the amount of said policy.

The second count alleged that the plaintiff and her late husband made an application to the defendant for a contract of insurance and a policy upon the life of said Hoyt, in the sum of $3000, payable on his death to the plaintiff, upon the payment to the defendant of the annual premium; that the defendant accepted and approved said application, and agreed to insure the life of said Hoyt, and to issue a policy to the plaintiff in the usual form; that the defendant executed a policy in the usual form, containing the contract and stipulations aforesaid, and delivered the same to its agents; that the agents informed the plaintiff and her husband that the contract was made and the policy executed, and the plaintiff and her husband accepted said contract and policy, and offered and tendered to the defendant's agents the premium and policy fee upon said contract and policy; that after said offer and tender said Hoyt died, and the plaintiff gave due notice of his death and made the proof of death required, and demanded

possession of the policy and the amount insured; that the defendant refused to give her said policy and to pay the amount insured.

The third count alleged the application, as set forth in the second count, the acceptance and approval thereof by the defendant, the issuing of a policy on September 21, 1865, and the delivery thereof to the defendant's agents; that on or about November 5, 1865, the defendant sent the policy to the plaintiff and her husband, and offered the same to them, and they agreed to receive the policy and did receive it, and the policy was then and there delivered to the plaintiff and her husband, and the defendant agreed to carry the policy to one Banks and get the money therefor; that if the defendant had carried the policy to said Banks, as agreed, the money would have been paid; that the amount of the premium was tendered on or about November 7, and a demand made for the policy; that the said Hoyt died on November 23, 1865, of which the defendant had due notice according to the requirements of the contract and policy.

The fourth count alleged that said Hoyt made an application in behalf of the plaintiff to the defendant to insure his life in the sum of $3000, payable to the plaintiff upon the death of said Hoyt; that the defendant accepted the application and agreed to insure and thereby did insure the life of said Hoyt, and agreed to pay the plaintiff the sum of $3000 upon the death of said Hoyt; that Hoyt died on November 23, 1865, of which death the defendant had notice, and the defendant owed the plaintiff the sum of $3000 and interest thereon.

The answer to the first count denied insuring the life f Hoyt, and that any policy made by the defendant was in face when Hoyt died. It also denied owing the plaintiff $3000 or any sum of money.

The answer to the second count denied that the defendant agreed to insure the life of Hoyt, and that the plaintiff was entitled to receive a policy as alleged. It averred that Hoyt made an application for an insurance upon his life in the sum of $3000; that the defendant made a policy, which was to be delivered to Hoyt upon his paying the premium therefor; that Hoyt never offered to pay said premium and receive the policy until on or about November 6, 1865, when he was dangerously sick of the

disease of which he died, and that the defendant then refused to receive said premium and deliver said policy by reason of Hoyt's sickness; that by the terms of the by-laws and rules and regulations, no policy could be delivered, nor any insurance made, unless the applicant should pay the premium therefor, and that no policy would be delivered to a person who was sick at the time of the application for delivery, unless he had paid the premium at the time of application for insurance; that Hoyt did not pay the premium upon application for said policy, and that he was sick when he offered to pay the same; that, before Hoyt offered to receive the policy and pay the premium, he refused to receive the policy or to pay the premium; and the defendant denied that it owed the plaintiff anything.

The answer to the third count denied that the defendant agreed to insure the life of Hoyt; that the plaintiff was entitled to receive a policy; that it had accepted the application and made a policy of insurance. The answer further denied all the other allegations of the declaration, and averred that, if at any time a policy was offered to the plaintiff or her husband while he was sick, it was without authority from the defendant and contrary to its by-laws, rules and regulations, and such offer, if made, was void and of no effect.

The answer to the fourth count averred that the defendant did not agree and did not insure the life of Hoyt as alleged; and denied the allegations of the declaration.

After the opinion reported in 103 Mass. 78, the case was tried again in the Superior Court, before *Lord*, J., and a verdict returned for the plaintiff. The defendant alleged exceptions, which were disallowed by the presiding judge. The bill of exceptions stated the evidence at length by questions and answers, and the charge of the judge in full. So much of it as appears to be material to the questions passed upon by the court was as follows:

The plaintiff put in evidence the application for insurance upon the life of James W. Hoyt, and also the policy of insurance written by the defendant company upon his life, (copies of which were made part of the bill of exceptions,) both papers being produced by the defendant upon notice by the plaintiff.

The application, dated September 21, 1865, and signed Eliza J. Hoyt, by James W. Hoyt, stated that Eliza J. Hoyt was de-

sirous of effecting insurance in the defendant company on the life of James W. Hoyt. The answers of the agent, which were on the same paper as the application, were signed " Ch. F. Wells, sub agt. for W. H. S. Jordan." The policy, which bore the same date as the application, recited as the consideration the sum of $59.40 paid by Mrs. Eliza J. Hoyt, and the annual premium of the same amount to be paid on September 21 in every year during the continuance of the policy.

The presiding judge asked the defendant's counsel whether it was contended that the application or policy contained any clause providing that the policy should not be delivered till the premium was paid ; and it was conceded that there was no such clause, nor anything on the subject, except the recital of payment of the premium. He also inquired whether there was anything to show that the applicant for insurance or the plaintiff had notice of any such limitation as to the authority to deliver policies without payment of premium, and it was conceded that there was not.

The plaintiff was then called as a witness, and testified as follows : " My late husband, James W. Hoyt, died at Ballardvale on November 23, 1865. I knew before his death that he had made an application to the defendant company for a policy. He was taken sick very late in October or very early in November. He was a file-hardener, in the employ of the Whipple File Company at Ballardvale, where we lived. I should think the application for insurance was a month or six weeks before he was taken sick. After his death, I collected his wages from the Whipple File Company. Mr. Wells came to see us, not a very great while after my husband was taken sick ; I cannot state the exact time, perhaps a week. He came in the morning between nine and eleven, I cannot state the exact time. My husband was at home, on the bed. Mr. Wells brought with him the policy, and passed it to my husband, saying that he had brought out to him his policy. My husband said he was glad of it ; he had been expecting it for some days past. My husband then took the policy and read it over. I stood by the bed, and he handed it to me, saying, ' Eliza, there is your policy.' And I took the policy, glanced it over, and laid it upon the table." The examination of this witness then proceeded as follows :

" *Qu.* At that time, did you understand that that policy was delivered to you to keep? *Ans.* Yes, sir.     [Objected to, but admitted, and exception taken.]

" *Qu.* How long did Mr. Wells stay at your house after that? *Ans.* A very few minutes after.

" *Qu.* What did your husband say to him? *Ans.* My husband told him he was not well enough to go out and get the money to pay for the policy, but he had made an arrangement with Mr. Banks, over at the shop, to get the money and pay it to him.

" *Qu.* What did Mr. Wells say? *Ans.* He said he would go directly to Mr. Banks and get the money for the policy.

" *Qu.* How long did you say he remained after that? *Ans* But a few minutes.

" *Qu.* When he went out, what was done? *Ans.* When he started to go out, I took the policy from the table and passed it to him, saying, ' If you are going to Mr. Banks for the money, you may need the policy,' and he took the policy.

" *Qu.* When did you, or your husband, first learn that the policy had not been given to Mr. Banks? *Ans.* The next morning.

" *Qu.* What was your object in giving the policy to Mr. Wells? *Ans.* I supposed he was going to Mr. Banks to get the money, and Mr. Banks would want to see the amount.

" *Qu.* You say that you learned the next morning that the policy had not been delivered to Mr. Banks by Mr. Wells? *Ans.* Yes, sir.

" *Qu.* From whom did you learn that? *Ans.* From Mr. Banks.

" *Qu.* What was done then? *Ans.* There were steps taken to have the money sent to Boston for the policy.

" *Qu.* That same day? *Ans.* Yes, sir.

" *Qu.* And immediately after you had learned that Mr. Wells had not given it to Mr. Banks? *Ans.* Yes, sir.

" *Qu.* At your husband's request? *Ans.* Yes, sir.

" *Qu.* Did you understand the money was sent? *Ans.* Yes, sir, I did.

" *Qu.* How long did your husband live after that? *Ans.* I should think it was two weeks or more.

" *Qu.* When the money was sent, what was his condition, as compared with what it was when Mr. Wells was there ? *Ans.* He was not much of any worse. He was not very sick at that time. He was about the house part of the time, on. the lounge part of the time, and on the bed.

" *Qu.* Did you know before Mr. Wells came there that your application had been accepted ? Was that the first information you had of the acceptance ? *Ans.* Yes, sir."

The defendant admitted that the money was sent, but it refused to accept it. It also made no question as to the proof of death. The plaintiff then rested.

Charles F. Wells, for the defendant, testified that in September and November, 1865, he was the agent to procure applications for the defendant company, for Mr. Jordan, and to deliver policies on the payment of premium ; that he had no authority to deliver policies without the payment of premiums ; that he did not intend to deliver this policy to Mr. Hoyt or to Mrs. Hoyt, without the payment of the premium. The cross-examination proceeded as follows :

" *Qu.* Were you the agent of this company at Ballardvale ? *Ans.* No, sir.

" *Qu.* Did your company have any agent at Ballardvale ? *Ans.* I don't know.

" *Qu.* Did you ever know of their having any? *Ans.* No, sir.

" *Qu.* You never heard of their having any there ? *Ans.* Never.

" *Qu.* You were not the agent there ? *Ans.* Not the agent.

" *Qu.* You said that your authority was to deliver policies upon the payment of the premium ? *Ans.* I did.

" *Qu.* And nothing else ? *Ans.* Nothing else.

" *Qu.* Cash payment ? *Ans.* I did n't say ' cash.'

" *Qu.* Did n't mean ' cash,' did you ? *Ans.* I meant cash.

" *Qu.* Do you now swear that you had no authority to deliver policies, except upon cash payments ? *Ans.* No, sir.

" *Qu.* You had authority to deliver policies without the payment of cash premiums ? *Ans.* No, sir.

" *Qu.* Did you ever deliver them without the cash ? *Ans.* Yes, sir.

" *Qu.* Knowing that you were not doing your duty ? *Ans.* No sir ; I was doing my duty.

" *Qu.* You understood, when you were delivering policies without the cash premiums, that you were doing your duty? *Ans.* Yes, sir.

" *Qu.* You supposed you had the right to do it, did n't you? *Ans.* Yes, sir; I think I did.

" *Qu.* You did have the right to do it, did n't you? *Ans.* Yes, sir.

" *Qu.* Was it known to you that, as sub-agent, you were required to receive the actual cash before you delivered the policy? *Ans.* Yes, sir; that was the rule; that was the order.

" *Qu.* But you said you had the right to do it without receiving the cash? *Ans.* I assumed the right.

" *Qu.* Did n't you say you had the right? *Ans.* I assumed the right.

" *Qu.* Did n't you swear that you had the right? *Ans.* I will say that I had the right, if it is necessary, if you wish it that way. It makes no difference."

*Reëxamination.* " *Qu.* Under what circumstances did you deliver policies at any time without the payment of the cash premiums? *Ans.* When I could get security for premium." ·

And on further cross-examination: " *Qu.* You were the sole judge of what security you would take when you took security? *Ans.* When I took security? Yes, sir."

The defendant then rested; and asked the judge to rule as follows:

" 1. That there is no evidence to warrant the jury in finding that there was any other agreement between the parties than that of a contract of insurance in the ordinary mode by a policy of insurance.

" 2. That there is no evidence upon which the jury can find that there was an agreement of the defendant company to insure the life of Hoyt, which would be binding upon it without delivery of the policy or payment of premium.

" 3. That the putting of the policy on the life of Hoyt in Wells's hands did not authorize him to make any agreement to deliver it, which would be binding on the company without payment of premium.

" 4. Or his having the policy in his hands did not authorize Wells to agree for insurance or delivery of the policy unless on actual payment."

The defendant's counsel stated that, in their view, the whole matter, as it stood upon the evidence, was a question of law ; and asked the judge, before deciding whether to address the jury, to state what were deemed to be questions of fact, what were questions of law, and what were to be the rulings upon them.

The judge said : " The questions of fact are, whether there was a delivery of the policy, and whether there was a contract so consummated that the party has a right to bring an action to recover the value of the policy."

The defendant's counsel then stated that they had already prayed for instructions on both those points ; and contended that the jury would not be warranted in finding a verdict for the plaintiff on either of these propositions, on any view of the evidence in the case.

The defendant's counsel waiving his right to address the jury, the case was argued for the plaintiff ; and, after the argument, the judge stated that he should ask the jury to answer five specific questions, hereinafter stated.   The defendant then requested the judge to instruct the jury that the evidence did not warrant a finding in favor of the plaintiff on any of these questions.

The judge, in his charge to the jury, submitted these questions to them and instructed them as follows:

" 1st. ' Had Wells authority from the defendant to deliver the policy without the payment of the premium ? '   Upon that point there is no evidence that I am aware of in the case — if there is, I desire to have my attention called to it — except the testimony of Wells himself, and you heard that testimony.   Does that satisfy you that he was vested with authority to deliver the policy on any other terms than the payment of the premium ?   Had he a right to make any arrangement for the premium which he, in his judgment, thought it was proper to make ?   He testified, in the first instance, that he had no authority to deliver the policy without the payment of the premium.   He afterwards said (and you will determine what construction to put upon his language) that he had a right to deliver the policy without the cash premium, by taking security instead of it, and that he himself was a judge of what that security should be.   From this evidence, you will answer the question, Whether he had authority from the company, or not, to deliver the policy without the payment of the premium ?

" 2d. Then there comes another question, which is entirely in‑ dependent of that, and that is, ' Whether, in point of fact, he did deliver it to tne plaintiff, intending to vest the property in her.' The plaintiff says that the policy was brought to her ; that it was passed over to her with the declaration, ' There is your pol‑ icy ; ' that she understood it to be a delivery to her, and that she laid it upon her table. Wells was called, and he was asked the question, ' Did you intend to deliver that policy without the pay‑ ment of the premium ? ' To that he said ' No ; ' and the question whether an article is delivered or not depends upon the acts of the parties, accompanied by the motive or intention with which those acts are done ; and the intention of Wells is as important as the intention of the plaintiff. He says he did not intend to deliver it without the payment of the premium. It is for you to determine, taking that in connection with the other evidence which he gave in the case in relation to the premium, whether he meant by that he did not mean to deliver it without either the cash premium, or such security as was satisfactory to himself, or whether he meant that he did not intend to deliver it without the actual cash in hand. And in either case, whichever view you take of that, you will pass upon the question, taking the evidence of Mrs. Markey and of Wells, that being the only testimony as to what took place at that time, and say whether or not the policy was then deliv‑ ered ; that is, whether the parties so understood it ; for if Wells consented to the proposition to let her keep the policy and he would go to Banks and get the money, and it was done in that view, that would be a delivery; and it is for you to determine whether he did thus consent or not.

" 3d. Suppose you find the policy to have been delivered to her, the parties understanding that it was delivered, and that Wells was to go to Banks and get his pay for it, and if you find also that she passed it back to him, as she says she did, then, ' Did she pass that back to him intending to give up the property in it, which belonged to her, to him, so as to revest the title to it in him, or did she pass it to him for a temporary purpose, to be returned to her ? ' The only evidence which bears upon that sub‑ ject, that I am aware of, is her declaration that she said, as Wells was going out of the door, ' If you are going to Mr. Banks for the money, you may as well take the policy and leave it with

him,' and you will answer that question as the evidence requires you to.

" 4th. Then, 'Did the parties come to an agreement for a contract of insurance by an application on her part, and an acceptance of such application by the defendant, with a writing of the policy and notice thereof to the plaintiff ? ' That there was an application, that there was an acceptance, that there was a writing of the policy, is not at all in controversy between the parties ; it is the other branch of this inquiry, which I am about to read, upon which there is controversy. ' Did the plaintiff, within a reasonable time, and under circumstances not materially changed, tender the amount of the premium and demand the policy ? ' Upon that you will answer ' yes ' or ' no,' as you find the evidence to be. The only evidence as to the time when the plaintiff knew that the application had been accepted and the policy prepared, comes from Mrs. Markey, who says that she first had notice of the policy when Wells brought it to the house ; and if that was so, and if a tender was made within a reasonable time thereafter, you will answer ' yes ' to the inquiry ; and a reasonable time thereafter, as matter of law, I instruct you, would be the next day ; and there being no evidence of any tender, except a tender upon the next day, if it was thus made it would be made within a reasonable time. So that to this interrogatory you will answer either ' yes ' or ' no,' as you find the fact to be.

" 5th. The next inquiry is, ' Had the defendant, before the tender, if you find such tender was made, withdrawn its acceptance of the application, and had it in any mode signified that its offer to insure, or its arrangement to insure, no longer continued ? '

" These are all the specific interrogatories which I propose to submit to you, and which I ask you to pass upon. I have been asked to give you instructions upon various other matters :

" 1. ' That there is no evidence to warrant the jury in finding that there was any other agreement between the parties than that of a contract of insurance in the ordinary mode, by a policy of insurance.' That, I think, will be a question of law, upon the facts as you shall find them, and I shall pass upon it at the proper time.

" 2. ' That there is no evidence upon which the jury can find that there was an agreement of the defendant company to insure

the life of Hoyt, which would be binding upon it without delivery of the policy or payment of the premium.' I make the same remark upon that.

" 3. ' That the putting the policy on the life of Hoyt in Wells's hands did not authorize him to make any agreement to deliver it, which would be binding on the company without the payment of the premium.' Upon that matter, I instruct you that that is a question of fact, and not of law ; that the question is one for you to settle, whether he had authority from the company ; and you have his testimony upon that subject, to which you will give such weight as you think proper. That is a question of fact for you to determine, and you will pass upon it as you think the facts warrant.

" 4. ' Or, his having the policy in his hands did not authorize Wells to agree for insurance or delivery of the policy unless on actual payment.' Wells had no authority to make a contract of insurance, as matter of law and as matter of fact, because there is no evidence that he had any authority ; and the special provisions of the policy are, that he had no authority. He says his authority was to deliver. I think that the answer to the first question, Whether he had authority to deliver without the payment, answers this whole inquiry ; and I submit the question to you what his authority was, not stating it as matter of law, because I think the authority is a question of fact and not of law."

The jury answered the 1st, 2d and 4th questions in the affirmative, the 5th in the negative, and to the 3d answered : " It was for a temporary purpose." The judge thereupon directed a general verdict for the plaintiff, which was entered.

" To the several rulings of the court, and refusals to rule, upon the exceptions to evidence and the prayers for instruction, the defendant excepts, and prays that its exceptions may be allowed."

Annexed to the bill of exceptions was the following certificate, signed by the judge :

" The presiding judge declines to allow this bill of exceptions for these reasons : It is an attempt to reproduce or transfer the trial and all its incidents to another forum, which (if it is ever possible to do) has not in this case been done to his satisfaction. The report of the evidence is, in his judgment, incomplete. In the testimony of the plaintiff, language is omitted which the pre-

siding judge heard, and which he deemed important, not only upon the question of delivery, but upon the question whether both parties understood, at the time, that the policy was delivered, and upon the question whether Wells knew that the plaintiff understood that the policy was delivered and made no suggestion that he did not so understand it.  In addition to what is reported by the bill, as having been said by the plaintiff about taking the policy to Banks, she used the words, ' and leave it there.'  In the testimony of Wells, the presiding justice is confident that he stated, in words, that he had authority to deliver policies without the payment of the premium; but whether he did use these words or not, the presiding judge is so certain that the words, ' right ' and ' authority ' were used by witness and counsel interchangeably and as synonymous, that he would violate his official duty to sanction any report of the evidence to a tribunal which did not hear it, which would leave it doubtful in any manner what idea was necessarily conveyed by the witness.  No suggestion was made at the trial, from any source, that such was not the use of the language.  The answer of the plaintiff reported, ' Not much of any worse,' the presiding judge understood, ' Not much, if any, worse.'  It should appear that there was no evidence offered of the extent of Wells's authority, except what came from Wells himself; but there was no evidence offered that there was any custom or usage which limited or defined the authority or power of insurance agents, and no suggestion was made that there is any rule of law which limits or defines the powers of any insurance agent, other than those of any other agent; and the extent of authority of the agent in this case was left as a question of fact for the jury.  It should also appear that it was assumed by the defendant, and assented to by the plaintiff, that Wells was appointed agent by one Jordan, who had full power to appoint him; that the nature and extent of his powers, whatever they were, were conferred by Jordan; and that Jordan was present in court and heard the testimony of Wells, and was not called as a witness.  It should also appear that Wells the witness and Wells the sub-agent are the same person, and that the insured had no communication on the subject of the application or policy or insurance with any other person than Wells till after the delivery.

" The presiding judge does not decline to allow this bill because any of his rulings are inaccurately stated, for he is not prepared to say that they are. Whether they, and which of them, are open to the defendant, it is for the Supreme Judicial Court to determine. Some of the prayers were declined for the reason that there was no basis for them upon the pleadings or the evidence. No exception was taken to the charge at its conclusion, and no request for any change in relation to matters upon which no prayers had been offered. The presiding judge is not aware that the defendant has any right of exception to any part of the charge, except to omissions of such rulings as were prayed for and which were properly raised upon the pleadings and evidence, and to such portions as were in conflict with the prayers. The prayers for instruction were submitted, and in relation to them the presiding judge charged as reported. He deems it due to the eminent counsel, who have presented the bill with all fairness and courtesy, to state precisely how far he agrees to the bill, and in what respects he dissents from it, and to allow, if competent for him to do so, that part which is not objectionable ; and does so allow it."

The defendant then filed a petition to establish the truth of its exceptions. The petition was referred by this court to a commissioner, to take the depositions of such witnesses as might be produced by either party, and to make report thereof to the court.

On the coming in of the commissioner's report, the question whether the truth of the exceptions alleged by the defendant had been established was argued in November, 1874.

*D. Foster*, for the defendant.

*J. W. Perry & D. Saunders*, for the plaintiff.

GRAY, C. J. The argument in this case has, by the agreement of counsel and with the sanction of the court, been confined to the question whether the truth of the exceptions alleged by the defendant at the trial is established, leaving the question of the validity of those exceptions, in case their truth is established, to be argued hereafter.

Upon a careful comparison of the exceptions, as alleged, with the certificate of the presiding judge, stating his reasons for disallowing them, and with the evidence reported by the commis-

sioner, all the variations appear to be merely verbal or quite unimportant, and do not affect the substantial truth of the exceptions, or the right of the excepting party to have the rulings excepted to revised by this court. *Bates* v. *Santom*, 116 Mass. 120. *Sawyer* v. *Yale Iron Works*, 116 Mass. 424.

1. The judge states that in the report of the testimony of Mrs. Markey, the plaintiff, language is omitted which he deemed material. The only omission which he specifies is that "in addition to what is reported by the bill, as having been said by the plaintiff about taking the policy to Banks, she used the words, ' and leave it there.' " But her testimony, as reported in the bill of exceptions, is not substantially varied by the omission of these words. It clearly implies that the plaintiff and her husband, at the interview in question, directed Wells to leave the policy with Banks — especially in that part of it in which she testifies to what they did immediately after she learned that Wells had not given the policy to Banks. And the bill of exceptions shows that the very words were attributed to the plaintiff by the presiding judge in his charge to the jury, without any objection being made to the accuracy of his statement of her testimony in this respect.

2. The omission to state that Wells testified, in very words, that he had authority to deliver policies without payment of the premium, is also immaterial; for the report of the testimony, of the requests for instructions, and of the instructions given, accords with the statement in the judge's certificate, that the words "right" and "authority" were treated throughout the trial as synonymous.

3. The variation between "not much of any worse " and " not much, if any, worse," is hardly greater in meaning than it is in sound. To hold an inaccuracy so trifling, and so likely to escape the utmost vigilance, to be fatal, would be to render the remedy provided by the statute valueless.

4. As the bill of exceptions purports to state all the evidence that was offered at the trial, it was unnecessary and would have been superfluous to state what was not offered.

5. The bill of exceptions shows that Wells testified that he was the agent to procure applications for the defendant " for Mr. Jordan ; " and this implies, as the counsel for the defendant admits, that Wells was appointed by Jordan.

The facts that Jordan was present at the trial and heard the testimony of Wells, and was not called as a witness, were wholly immaterial, unless they were brought to the attention of the jury at the trial, which does not appear by the certificate of the judge or otherwise.

6. It does appear, beyond dispute, that Wells the witness and Wells the sub-agent were the same person.

7. The exceptions, as stated in the bill tendered, are in terms limited to the rulings and refusals to rule upon the exceptions to evidence and the requests for instructions, and therefore do not cover any ruling or instruction which the judge does not admit by his certificate to have been duly excepted to.

*Truth of exceptions established.*

The case was argued on the exceptions in January, 1875.

*D. Foster*, for the defendant.

*J. W. Perry & D. Saunders*, for the plaintiff.

GRAY, C. J.    The plaintiff undertook to prove a contract by the defendant to insure $3,000 on the life of her husband, payable to her : 1st, by a policy executed by the defendant, and delivered by Wells as its agent to the plaintiff; 2d, by a contract to insure independently of any policy.

1. Upon the issue whether the policy was a contract binding the defendant, one question submitted to the jury was whether Wells " did deliver the policy to the plaintiff, intending to vest the property in her."

Upon this question, the testimony introduced by the plaintiff did not substantially differ from that introduced at the former trial, and which this court, for reasons fully stated in 103 Mass. 78, which upon reconsideration we are satisfied with, and do not propose to recapitulate, held insufficient to warrant a jury in finding such intention.

It amounted to this and no more :    That the husband being ill at home, Wells came to the house, bringing the policy with him, and passed it to the husband, saying he had brought him his policy ; that the husband said he was glad of it, he had been expecting it for some days past; that he took the policy and read it over, and handed it to the wife, saying, " Eliza, there is your policy," and she took it, glanced it over, and laid it upon the

table; that the husband told Wells "that he was not well enough to go out and get the money to pay for the policy, that he had made an arrangement with Mr. Banks over at the shop to get the money and pay it to him," and Wells said "he would go directly to Mr. Banks and get the money for the policy;" that, when Wells started to go out, the wife took the policy from the table and passed it to him, saying, "If you are going to Mr. Banks for the money you may need the policy, and may as well take it and leave it with him," and Wells took the policy; that her object in giving the policy to Wells was that she supposed he was going to Banks to get the money, and Banks would want to see the amount; and that upon her learning the next morning from Banks that the policy had not been delivered to him by Wells, the money was immediately sent to Boston for the policy.

The direction to leave the policy with Banks had no tendency to prove that the policy had been delivered; for it was equally consistent with the alternative that it was to be delivered to Banks, for the use of the plaintiff, upon his payment of the premium to Wells.

The testimony of the plaintiff that, when she took the policy from her husband in the presence of Wells, she understood it was delivered to her to keep, whatever its legal competency and weight might be on the question of her own intention, had no tendency to prove the intention of Wells.

The testimony of Wells, upon the question whether he had authority to deliver policies without payment of the premium, added nothing to the evidence upon the question whether he actually intended to deliver this policy.

The whole evidence was in our opinion insufficient to warrant the jury in finding that the policy had been delivered so as to constitute a binding contract.

2. The plaintiff's own testimony, already stated, shows that the only form of contract of insurance, contemplated by the parties, was by a policy issued by the defendant upon the written application of the assured, and there is no evidence whatever that the defendant intended, or was understood by the assured or the plaintiff to intend, to make a contract of insurance in any other form. *Real Estate Ins. Co.* v. *Roessle*, 1 Gray, 336. *Sanborn* v. *Fireman's Ins. Co.* 16 Gray, 448, 454. *Hoyt* v. *Mutual Benefit*

*Ins. Co.* 98 Mass. 539. *Heiman* v. *Phœnix Ins. Co.* 17 Minn. 153.

This point, having been presented by the defendant in a distinct request for instructions at the trial, for the manifest purpose of reserving the question, and overruled by the presiding judge, is clearly open upon these exceptions. *Esty* v. *Wilmot*, 15 Gray, 168. *Markey* v. *Mutual Benefit Ins. Co.* 103 Mass. 78, 87.

The jury having been erroneously instructed as to the sufficiency of the evidence upon each of the grounds upon which the plaintiff sought to recover, the defendant's

*Exceptions must be sustained.*